UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH ZAPPIA, Individually and on Behalf of All Others Similarly Situated<br><br>Plaintiff,<br><br>v.<br><br>AVIDXCHANGE HOLDINGS, INC., MICHAEL PRAEGER, JAMES HAUSMAN, J. MICHAEL MCGUIRE, TERESA MACKINTOSH, LANCE DRUMMOND, ASIF RAMJI, SONALI SAMBHUS, ONI CHUKWU, and A.J. RUBADO,<br><br>Defendants. | Case No. 1:25-cv-5727<br><br>**COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Joseph Zappia ("Plaintiff"), individually and on behalf of all others similarly situated, by the undersigned attorneys, alleges as follows based (i) upon personal knowledge with respect to Plaintiff's own acts, and (ii) upon information and belief as to all other matters based on the investigation conducted by Plaintiff's attorneys, which included, among other things, a review of relevant U.S. Securities and Exchange Commission ("SEC") filings, and other publicly available information.

**NATURE OF THE ACTION**

1.      This action is brought by Plaintiff against AvidXchange Holdings, Inc. ("Avid" or the "Company") and the members of Avid's board of directors ("Board") for (i) violating Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(a) and § 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9(a) ("Rule 14a-9"), and (ii) breaching their fiduciary duties under Delaware law. Plaintiff's claims arise in connection with the solicitation of public stockholders of

Avid to vote in favor of the proposed sale of Avid to TPG Global, LLC ("TPG") and Corpay, Inc. ("Corpay") in exchange for payment of $10.00 per share in cash ("Transaction Consideration") to Avid stockholders (the "Transaction"). Notably, TPG had first explored a possible investment in Avid in 2020, prior to Avid's initial public offering ("IPO") in October 2021, and thereafter had from time to time discussed Avid's performance with certain members of Avid management.

2.      On May 6, 2025, Avid issued a press release announcing the Transaction. The Transaction is expected to close in the fourth quarter of 2025, pending customary approvals and shareholder vote.

3.      On June 17, 2025, Defendants authorized the filing of a false and misleading preliminary proxy on Schedule 14A ("Proxy") with the SEC, in (i) violation of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9, and (ii) breach of their fiduciary duties under Delaware law, with the aim of soliciting Avid stockholders to vote for the Transaction at a special meeting of Avid stockholders on a date yet to be scheduled ("Stockholder Vote"). The Proxy advises Avid stockholders that "*[y]our vote is important to us*."

4.      As detailed below, the Proxy contains materially false statements, and material omissions that render statements therein misleading, that violate the above-referenced Exchange Act provisions and Rule 14a-9, and constitute breaches of fiduciary duty under Delaware law.

5.      The foregoing violations and breaches must be cured in advance of the Stockholder Vote to enable Avid stockholders to cast informed votes with respect to the Transaction. Therefore, Plaintiff seeks to enjoin Defendants from taking any further steps to consummate the Transaction and schedule the Stockholder Vote, until such violations are cured. Alternatively, if the Transaction is consummated, Plaintiff reserves the right to recover damages suffered by Plaintiff

2

and similarly-situated investors as a result of such violations.[1]

**JURISDICTION AND VENUE**

6.      This Court has subject matter jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction). This Court also has supplemental subject matter jurisdiction over the Delaware state law claims for breaches of fiduciary duty pursuant to 28 U.S.C. § 1367.

7.      This Court has personal jurisdiction over each of the Defendants because each has sufficient minimum contacts with the United States so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. *See Moon Joo Yu v. Premiere Power LLC*, No. 14 CIV. 7588 KPF, 2015 WL 4629495, at *5 (S.D.N.Y. Aug. 4, 2015) (because Exchange Act provides for nationwide service of process, and Defendant resides within the United States, and conducts business within the United States, he should reasonably anticipate being hauled into court in the United States, and Court's exercise of personal jurisdiction over Defendant with respect to Plaintiff's securities fraud claim is proper); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 NRB, 2015 WL 6243526, at *23 (S.D.N.Y. Oct. 20, 2015) ("[w]hen the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process . . . Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state.").

8.      Venue is proper in this District under 15 U.S.C. § 78aa(a) and 28 U.S.C. § 1391(b)

---

[1] A copy of the full Proxy is available at:
https://www.sec.gov/Archives/edgar/data/1858257/000114036125022843/ny20049415x1_prem14a.htm

because an act or transaction constituting the violations alleged herein occurred in this District. Specifically, (i) Avid's stock traded under the ticker "AVDX" on Nasdaq, which is headquartered in this District; (ii) the false and misleading Proxy was filed with the SEC, which has a regional office in this District; and (iii) Avid retained Innisfree M&A Incorporated, a proxy solicitor, which is headquartered in this District. *See Avalon Holdings Corp. v. Gentile*, 2019 WL 4640206, at *4 (S.D.N.Y. Sept. 24, 2019) (venue proper for Exchange Act claim in Southern District of New York under 15 U.S.C. § 78aa(a) because stock traded on exchange located in said District) (citing *United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003)).

**PARTIES**

9.      Plaintiff is and has been a stockholder of Avid common stock at all relevant times.

10.      Defendant Avid is a Delaware corporation with its principal executive offices located at 1210 AvidXchange Lane, Charlotte, NC 28206. Avid provides software-as-a-service-based accounts payable software and solutions for over 8,500 businesses and their suppliers. Avid's accounts payable platform has made payments to more than 1,350,000 suppliers over the past five years. It trades under the ticker "AVDX" on the Nasdaq.

11.      Defendant Michael Praeger ("Praeger") has served as President and Chief Executive Officer ("CEO") of Avid, and Chairman of the Board at all relevant times. Defendant Praeger signed the Proxy.

12.      Defendant James Hausman ("Hausman") served as a member of the Board at all relevant times, and also served as a member of the transaction committee ("Transaction Committee") formed by the Board on December 18, 2024, to provide oversight, direction and feedback to Avid's management and financial advisors, and to assist the Board in fulfilling its responsibilities in connection with the evaluation of potential strategic alternatives available to

Avid.

13.    Defendant Asif Ramji ("Ramji") served as a member of the Board at all relevant times, and also served on the Transaction Committee.

14.    Defendant A.J. Rubado ("Rubado") served as a member of the Board at all relevant times, and also served on the Transaction Committee

15.    Defendant J. Michael McGuire served as a member of the Board at all relevant times.

16.    Defendant Teresa Mackintosh served as a member of the Board at all relevant times.

17.    Defendant Lance Drummond served as a member of the Board at all relevant times.

18.    Defendant Sonali Sambhus served as a member of the Board at all relevant times.

19.    Defendant Oni Chukwu served as a member of the Board at all relevant times.

20.    Defendants identified in paragraphs 11-19 are collectively referred to herein as the "Individual Defendants," and together with Avid, collectively, the "Defendants."

## SUBSTANTIVE ALLEGATIONS[2]

### Avid's Financial Advisory Relationship With FT Partners

21.    On August 24, 2010, Avid engaged Financial Technology Partners LP and FTP Securities LLC (collectively, "FT Partners") as its financial and strategic advisor. Between 2010 and 2021, FT Partners acted as an advisor to Avid in connection with a number of debt and equity capital raises and other matters. Additionally, on five separate occasions between 2010 and 2016, entities controlled by Steve McLaughlin, Managing Partner of FT Partners, invested in Avid's equity securities for a total of 1,369,630 shares.

---

[2] Any emphasis in quoted language is added, unless otherwise noted.

22.     On February 19, 2021, Avid and FT Partners entered into an amended and restated engagement letter, pursuant to which Avid paid $50,000,032.91 in cash to FT Partners, which FT Partners immediately invested in Avid's common stock at a price of $49.012 per share for a total of 1,020,159 shares, which shares were subsequently transferred by FT Partners to an entity controlled by Mr. McLaughlin. Following the completion of a four-for-one forward stock split of Avid's stock on September 30, 2021, entities controlled by Mr. McLaughlin owned a total of 9,559,156 shares of Avid's common stock.

**Latham & Watkins Begins Advising the Board Concerning Strategic Alternatives**

23.     During August and September 2024, certain members of Avid management and the Board received a number of inbound inquiries from third parties regarding a possible sale of Avid.

24.     On September 24, 2024, the Board held a regularly scheduled meeting. During the executive session of the Board, which was attended by members of Avid management and representatives of the law firm of Latham & Watkins LLP ("Latham") advised the Board on their fiduciary duties with respect to the inbound inquiries. Members of Avid management then provided the Board with a list of third parties that may be interested in a potential transaction involving Avid, and the Board discussed conducting a market check to better understand the potential interest in a transaction involving Avid. Following discussion, the Board determined that a market check involving a limited set of bidders would be beneficial to informing the Board's overall view of strategic alternatives. The Board directed Avid management to continue to work with FT Partners to update Avid's preliminary valuation framework and to conduct discussions and enter into confidentiality agreements with certain third parties that the Board determined were most likely to be interested in and able to complete a transaction involving Avid. Following discussion with representatives of Latham, the Board also directed Avid management not to have

any conversations with any third parties about an equity rollover or other employment terms unless and until approved by the Board.

25.    As per the direction of the Board, from September 2024 through April 2025, Avid entered into confidentiality agreements with ten potential counterparties, *including TPG and Corpay*.

26.    On December 10, 2024, members of Avid management and the Board met in a working session to discuss potential strategic transactions and other matters. Representatives of FT Partners and Latham were present at the meeting. Representatives of FT Partners and members of Avid management summarized the meetings and discussions that members of Avid management had to date with potential interested parties. With respect to the market check previously discussed by the Board, members of Avid management provided the Board with an updated list of third parties that members of Avid management had determined, with input from representatives of FT Partners and members of the Board, may be interested in a potential transaction involving Avid. Members of Avid management and representatives of FT Partners provided an update on their work in preparing Avid's preliminary valuation framework. Representatives of Latham and the Board then discussed the possibility of forming a transaction committee to support a possible sale process, and determined to discuss this further at the next meeting of the Board.

**Latham Advises the Board to Form a Transaction Committee**

27.    On December 18, 2024, the Board held a regularly scheduled meeting at which members of Avid management and representatives of Latham and FT Partners were present. A representative of FT Partners summarized the meetings and discussions that members of Avid management had to date with potential interested parties, *including TPG*, and reviewed FT

Partners' preliminary financial analysis of Avid based on certain forecasts prepared by Avid management in December 2024 ("December 2024 Forecasts"). A representative from Latham again advised the Board on their fiduciary duties with respect to a potential transaction involving Avid and other legal considerations related to exploring potential transaction options. Based on the discussions and interest to date, the Board determined it was advisable to continue gauging the various parties' interest in acquiring Avid, including through the portfolio companies of various financial sponsors, and to conduct a process to solicit bids from those parties for a potential transaction. During the executive session of the Board, the Board discussed and approved the formation of a transaction committee comprised of Defendants Hausman, Ramji and Rubado to more efficiently provide oversight, direction and feedback to Avid management and Avid's financial advisors and to assist the Board in fulfilling its responsibilities in connection with the evaluation of potential strategic alternatives available to Avid.

**The Proxy Misleadingly Suggests That FT Partners' Conflicts Were the Only Advisor Conflicts Requiring Mitigation**

28.     On December 30, 2024, the Transaction Committee held a meeting, during which the General Counsel of Avid and representatives of Latham were present. At the meeting, the Transaction Committee discussed certain relationships and potential issues involving FT Partners and Mr. McLaughlin, including FT Partners' and Mr. McLaughlin's long-standing relationship with Avid and Avid management, the significant ownership stake in Avid beneficially owned by Mr. McLaughlin (i.e., 9,559,156 shares of Avid's common stock), the significant fee that would be payable to FT Partners upon the consummation of a strategic transaction involving Avid, the employment by affiliates of Mr. McLaughlin of a family member of Defendant Praeger, and that the engagement letter between Avid and FT Partners did not provide that FT Partners would render a fairness opinion in connection with a strategic transaction involving Avid. Based on such

potential conflicts, the Transaction Committee discussed with representatives of Latham the advisability of engaging a co-lead financial advisor to provide strategic advice and render a fairness opinion in a possible transaction in light of these potential relationships and issues. The Transaction Committee determined to consider the matter further at a subsequent meeting.

29.    As alleged more fully below, the Proxy's narrative of the Transaction Committee's discussion with Latham on December 30, 2024, is misleading by omission to the extent it suggests that the potential conflicts of FT Partners were the *only* potential advisor conflicts that necessitated the engagement of a co-advisor. In fact, Latham itself had a potential conflict advising Avid with respect to a potential transaction with TPG arising from Latham's extensive past and concurrent representations of TPG, including Latham partners who previously worked on behalf of TPG, and then worked on behalf of Avid in connection with the proposed sale to TPG (as detailed further in paragraphs 88-89 below). In particular, as of December 30, 2024, Latham knew that TPG was a potential counterparty since TPG had (i) first explored a possible investment in Avid in 2020, (ii) discussed Avid's performance with certain members of Avid management from time to time after Avid's IPO in October 2021, and (iii) as of December 18, 2024, had already met with members of Avid management to discuss a potential transaction with Avid after the Board had launched the strategic review process in September 2024. Yet, the Proxy misleadingly indicates that the potential conflicts of FT Partners were the *only* potential conflicts that required mitigation.

**As Per Latham's Advice, the Transaction Committee Retains a Co-Lead Financial Advisor**

30.    On January 6, 2025, the Transaction Committee held a meeting at which members of Avid management and representatives of Latham were present. The Transaction Committee met in executive session with the General Counsel of Avid and the representatives of Latham prior to the meeting. During the meeting of the Transaction Committee, a member of Avid management

provided an update on the meetings and strategic discussions that members of Avid management had to date with potential interested parties. A member of Avid management also presented the December 2024 Forecasts to the Transaction Committee. The Transaction Committee and representatives of Latham then continued their discussion from the December 30, 2024 meeting of the Transaction Committee regarding the potential engagement of a co-lead financial advisor in connection with a sale process, and the Transaction Committee determined that engaging a co-lead financial advisor, including to render a fairness opinion in a possible transaction, was in the best interests of Avid and its stockholders.

31.     The Transaction Committee discussed potential financial advisors, and ultimately selected Barclays, based upon (among other matters) Barclays' familiarity with Avid from its IPO, its investment banking experience in the industry in which Avid competes and its significant experience and expertise in similar transactions (including in co-advisor arrangements). The Transaction Committee authorized Avid management to provide the December 2024 Forecasts to potential bidders and authorized members of Avid management to contact representatives of Barclays to discuss their engagement as co-lead financial advisor.

32.     On January 8, 2025, members of Avid management, including Defendant Praeger, and a representative of FT Partners met with representatives of TPG to discuss a potential transaction involving Avid.

33.     On January 10, 2025, the Transaction Committee held a meeting at which members of Avid management and representatives of Latham were present. During the meeting, a member of Avid management provided an update on the meetings and discussions that members of Avid management had to date with potential interested parties. The Transaction Committee and representatives of Latham then discussed the engagement of Barclays as co-lead financial advisor,

and a representative of Latham presented an illustrative process timeline that was prepared by representatives of FT Partners. A member of Avid management then led a discussion with the Transaction Committee regarding potential next steps in connection with a possible sale process.

34.    From January 10, 2025 through January 12, 2025, representatives of Barclays and Defendant Rubado had a number of discussions regarding Barclays' role as co-lead financial advisor of Avid and immediate next steps on the potential sale process.

35.    On January 12, 2025, a representative of TPG had a call with Defendant Praeger to discuss a potential transaction involving Avid.

36.    During the morning of January 13, 2025, the Transaction Committee held a meeting at which members of Avid management and representatives of Latham and Barclays were present. Representatives of Barclays discussed the sales process with the Transaction Committee, including whether to reach out to additional third parties beyond those already involved. Following a discussion of the risks and benefits of reaching out to additional third parties, including the competitive risks associated with engaging with certain strategic parties, the Transaction Committee determined that it was not in the best interests of Avid to invite additional parties to participate in the process at the time.

37.    During the afternoon of January 13, 2025, the Transaction Committee reconvened at a meeting, at which members of Avid management and representatives of Latham and FT Partners were present. Defendant Rubado provided an update on Barclays' participation as co-lead financial advisor.

38.    On January 14, 2025, the Transaction Committee held a meeting at which members of Avid management and representatives of Latham, Barclays and FT Partners were present. The Transaction Committee discussed the respective roles of Barclays and FT Partners as co-lead

financial advisors and directed that both financial advisors participate in all future substantive communications with potential bidders, where feasible. The Transaction Committee discussed next steps in the sale process, including the terms of the process letters prepared by Avid's advisors.

**Advised by Latham, the Transaction Committee Entertains Bids From Several Potential Counterparties, and Negotiates the Proposed Sale of Avid to TPG and Corpay**

39.    On January 15, 2025, at the direction of the Transaction Committee, representatives of Barclays and FT Partners shared an initial process letter with the following potential counterparties: Sponsor A, Sponsor B, Sponsor D, Sponsor E, Sponsor F and TPG. The process letters provided for a deadline of January 28, 2025, for first-round bids. Data room access was made available to these six parties the next day.

40.    On January 17, 2025, the Transaction Committee held a meeting at which members of Avid management and representatives of Latham, Barclays and FT Partners were present. Representatives of FT Partners and Barclays provided an update on the process, and the Transaction Committee discussed the expected timeline of potential bids and the due diligence process. A representative of Latham then provided a summary of the draft Merger Agreement that had been prepared by Latham and discussed with the Transaction Committee specific terms of the draft Merger Agreement, including the go-shop provision and applicability and ranges of termination fees.

41.    On January 24, 2025, Avid entered into an engagement letter with Barclays regarding its role as a co-lead financial advisor in connection with a potential transaction.

42.    On January 28, 2025, Sponsor D submitted a preliminary bid for Avid of $10.75 to $11.25 per share in cash (the "Sponsor D Bid").

43.    On January 31, 2025, TPG submitted a preliminary bid for Avid of $12.00 to $13.00

12

per share in cash (the "January 31 TPG Bid").

44.    On February 3, 2025, the Transaction Committee held a meeting at which members of Avid management and representatives of Latham, Barclays and FT Partners were present. Representatives of Barclays and FT Partners reviewed and compared the Sponsor D Bid and the January 31 TPG Bid, including with respect to offer price, transaction structure and source of funds, diligence requirements and expected time to completion. A member of Avid management then presented revised assumptions and lowered forecasts driving a new long-range plan based on Avid's actual performance during the initial portion of the first quarter of 2025 and changes in the macroenvironment.

45.    Later on February 3, 2025, the Board held a special meeting at which members of Avid management and representatives of Latham, Barclays and FT Partners were present. Representatives of Latham again advised the Board on their fiduciary duties in connection with their consideration of a potential transaction. Representatives of Barclays and FT Partners then reviewed and compared the Sponsor D Bid and the January 31 TPG Bid, including with respect to offer price, transaction structure and source of funds, diligence requirements and expected time to completion. Representatives of Barclays then left the meeting, and representatives of FT Partners reviewed its preliminary financial analysis of Avid based on the December 2024 Forecasts, and the Board was given the opportunity to discuss the material relationships disclosure prepared by FT Partners and provided to the Board prior to the meeting. Representatives of FT Partners then left the meeting, and representatives of Barclays rejoined the meeting and reviewed its preliminary financial analysis of Avid based on the December 2024 Forecasts, and the Board was given the opportunity to discuss the material relationships disclosure prepared by Barclays and provided to the Board prior to the meeting.

46.     On February 4, 2025, the Transaction Committee held a meeting at which members of Avid management and representatives of Latham, Barclays and FT Partners were present. The Transaction Committee discussed potential responses to the Sponsor D Bid and the January 31 TPG Bid, and directed Avid management to work with Avid's financial advisors to prepare a presentation on Avid's incremental revenue growth drivers and discuss such growth potential with each of Sponsor D and TPG.

47.     On February 8, 2025, representatives of TPG shared a list of potential lenders for which TPG was seeking approval to contact regarding debt financing for the potential transaction. Following discussion with members of the Transaction Committee and representatives of Latham, and at the direction of the Transaction Committee, on February 10, 2025, representatives of Barclays and FT Partners confirmed on behalf of Avid that TPG was permitted to reach out to a subset of such lenders.

48.     On February 17, 2025, the Transaction Committee held a meeting at which members of Avid management and representatives of Latham, Barclays and FT Partners were present. A member of Avid management provided an update on the meetings with Sponsor D and TPG, and the Transaction Committee discussed, among other topics, the next steps regarding the sale process, including timing for sharing a draft Merger Agreement with the bidders.

49.     Subsequently, Sponsor D exited the sales process, but Avid received an inbound inquiry from a potential bidder identified as Sponsor G. The Transaction Committee also subsequently discussed that representatives of Corpay had previously expressed interest in a transaction involving Avid.

50.     On March 24, 2025, Sponsor G submitted a preliminary bid of $9.50 to $10.00 per share in cash (the "Sponsor G Bid"). In the Sponsor G Bid, Sponsor G indicated that it expected

14

to fund the transaction with a combination of equity and third-party debt financing, and that it expected to complete due diligence over approximately three weeks while simultaneously negotiating definitive transaction documentation. Sponsor G also indicated in the Sponsor G Bid that it would discuss go-forward incentive equity arrangements with the executive team of Avid at the appropriate time.

51.    On March 25, 2025, TPG submitted an updated bid of $10.00 per share in cash (the "March 25 TPG Bid"). In the March 25 TPG Bid, TPG indicated that it expected to fund the transaction with a combination of new equity and third-party debt financing, that it expected significant management equity rollover, and that it would work with Avid management to create a management equity incentive plan equating to 10% fully diluted ownership. TPG also indicated in the March 25 TPG Bid that it expected to complete confirmatory due diligence and sign definitive transaction documentation within three to four weeks.

52.    Later on March 25, 2025, the Transaction Committee held a meeting at which members of Avid management and representatives of Latham, Barclays and FT Partners were present. Prior to members of Avid management joining the meeting, a member of the Transaction Committee provided an update on the process and led a discussion regarding the March 25 TPG Bid and the Sponsor G Bid, including with respect to the equity rollover by management proposed in the March 25 TPG Bid.

53.    On March 26, 2025, the Board held a meeting at which members of Avid management and representatives of Latham, Barclays and FT Partners were present. During the meeting, a representative of Latham led a discussion at an executive session regarding a possible equity rollover by members of Avid management in a transaction, as contemplated by the March 25 TPG Bid.

54.     On March 27, 2025, the Board held a meeting at which members of Avid management and representatives of Latham were present. The Board met in executive session with the General Counsel of Avid and representatives of Latham prior to the meeting to discuss targeted outreach to Strategic Company and Corpay regarding a possible transaction. During the meeting of the Board, after discussion, and in light of Avid's performance and the risks and challenges associated with continuing as a standalone company, the Board determined to continue to pursue a sale transaction. The Board directed that Avid's financial advisors request "best-and-final" bids from each of Sponsor G and TPG within two weeks and, from among the other parties that had reached out with an interest in a possible transaction involving Avid, to conduct targeted outreach to Strategic Company and Corpay regarding a possible transaction due to the Board's belief in a greater likelihood of executing a transaction with one of those parties than with the other parties that had reached out.

55.     On March 31, 2025, the Board held a special meeting at which members of Avid management and representatives of Latham, Barclays and FT Partners were present. Representatives of FT Partners and Barclays provided an update on the sale process. Discussion ensued among members of the Board and Avid management and representatives of Barclays and FT Partners regarding strategic parties that may be interested in a transaction involving Avid, including Strategic Company and Corpay and other potential strategic parties, including portfolio companies of financial sponsors that had previously participated in the process or inquired regarding a possible transaction with Avid. Members of Avid management also discussed their observations regarding the risks of engaging with additional strategic parties, including the competitive risks of sharing due diligence information with strategic parties. The Board concluded that Strategic Company and Corpay were likely to be the most interested strategic parties and that

16

Avid should not contact any other strategic parties at that time. A representative of Latham then led a general discussion of preliminary antitrust and regulatory considerations in connection with a transaction involving a strategic party, and more specifically, preliminary antitrust and regulatory considerations with respect to Strategic Company and Corpay.

56.     On April 2, 2025, an auction draft of the Merger Agreement was posted to the data room. The auction draft of the Merger Agreement provided for a go-shop period and a "hell-or-high-water" standard for regulatory efforts.

57.     On April 3, 2025, the Transaction Committee held a meeting at which the General Counsel of Avid, and representatives of Latham, Barclays and FT Partners were present. The Transaction Committee discussed a proposed timeline for engagement with strategic parties, including with respect to execution of confidentiality agreements, clean team agreements and markups of the Merger Agreement. A further discussion ensued regarding the appropriate deadline for revised bids from financial sponsors and initial bids from strategic companies in light of the Board's desire to announce a transaction in advance of Avid's expected first quarter 2025 earnings release on May 7, 2025, given the expected impact of such earnings on Avid's stock price. The Transaction Committee directed Avid's financial advisors to request revised bids from Sponsor G and TPG, and initial bids from Strategic Company and Corpay, with a deadline of April 16, 2025.

58.     On April 11, 2025, representatives of TPG shared a markup of the Merger Agreement with representatives of Barclays and FT Partners. Among other proposed changes, the markup of the Merger Agreement removed the goshop period.

59.     On April 16, 2025, Mr. Clarke informed a representative of FT Partners that Corpay had become aware that TPG was pursuing a potential transaction with Avid and that Corpay was

seeking to partner with TPG in connection with a potential transaction involving Avid.

60. On April 17, 2025, TPG submitted an updated bid for Avid of $10.00 per share in cash (the "April 17 TPG Bid"). In the April 17 TPG Bid, TPG indicated that its proposal was subject to finalizing agreements with strategic partners, including Corpay, among others, and that it expected to fund the transaction with a combination of new equity, an equity rollover from a significant institutional stockholder (the "Institutional Stockholder"), an equity rollover from members of management, an equity commitment from Corpay and third-party debt financing. TPG also indicated that it expected to complete confirmatory due diligence and sign a transaction within two weeks.

61. Later that day, the Board held a special meeting at which members of Avid management and representatives of Latham, Barclays and FT Partners were present. A member of the Transaction Committee provided an overview of the process, including that Sponsor G had declined to submit a revised bid and that while Corpay had not submitted a bid, the April 17 TPG Bid referenced a possible joint bid with Corpay. Representatives of TPG then joined the meeting to present on TPG's vision for Avid and to review the April 17 TPG Bid with the Board. The representatives of TPG exited the meeting and discussion ensued regarding the April 17 TPG Bid. A representative of Latham then provided a summary of TPG's markup of the Merger Agreement.

62. On April 18, 2025, the Transaction Committee held a meeting at which members of Avid management and representatives of Latham, Barclays and FT Partners were present. The Transaction Committee initially met in executive session to discuss various considerations regarding Corpay's role in a potential transaction. Representatives of Barclays and FT Partners then joined the meeting and provided additional details regarding the April 17 TPG Bid following their discussion with representatives of TPG, including that representatives of TPG had indicated

that, in light of market conditions and Avid's expected first quarter 2025 earnings results, Corpay's involvement was essential to TPG reaching its offer price of $10.00 per share. The Transaction Committee then reconvened in executive session to further discuss regulatory matters and the proposed equity rollovers from Institutional Stockholder and management, and directed Avid's financial advisors to request that TPG submit a formal request to jointly bid with Corpay.

63.    Following outreach by Avid's financial advisors as directed by the Transaction Committee, on April 19, 2025, representatives of TPG sent a formal request to representatives of FT Partners and Barclays for TPG to share information regarding Avid and a possible transaction with Corpay as a potential equity financing source. Avid agreed to TPG's request on the basis that Corpay enter into a clean team addendum to the confidentiality agreement between Corpay and Avid, and that TPG agree to certain restrictions on information sharing with Corpay. Avid and Corpay executed a clean team addendum to the confidentiality agreement between Corpay and Avid on April 20, 2025.

64.    Later on April 19, 2025, the Transaction Committee held a meeting at which members of Avid management and representatives of Latham were present. A representative of Latham discussed in detail the draft Merger Agreement received from TPG on April 11, 2025, and the positions reflected in Latham's proposed markup of the Merger Agreement. The Board authorized representatives of Latham to share a revised draft of the Merger Agreement on the terms discussed.

65.    On April 21, 2025, following the direction of the Board, representatives of Latham shared a revised draft of the Merger Agreement with representatives of Davis Polk & Wardwell, legal counsel to TPG ("Davis Polk"), which reinstated the go-shop provision and "hell-or-high-water" regulatory obligations, as well as an initial draft of Avid disclosure letter.

66. On April 22, 2025, a representative of Sponsor G called Mr. Ramji to express continued interest in a transaction involving Avid and his belief that the Sponsor G Bid was competitive given Avid's expected results for the first quarter of 2025.

67. On April 25, 2025, the Transaction Committee held a meeting at which members of Avid management and representatives of Latham, Barclays and FT Partners were present. Representatives of Barclays and FT Partners provided an update on the sale process, and a member of the Transaction Committee relayed the recent call from Sponsor G. Discussion ensued regarding the April 17 TPG Bid in light of Avid's recent financial performance and market headwinds. Noting that Latham had not yet received revised drafts of the transaction documents from Davis Polk, the Transaction Committee directed Avid's financial advisors to provide a deadline for TPG to provide markups of the transaction documents, verify its proposed purchase price and provide definitive responses on a list of open transaction points, including with respect to the proposed equity rollover from Institutional Stockholder, equity rollover from management and partnership between TPG and Corpay.

68. On April 26, 2025, and April 27, 2025, representatives of Davis Polk shared revised drafts of the transaction documents with Latham, including a revised draft of the Merger Agreement, which removed the go-shop provision and limited the parties' obligations to obtain regulatory approvals. Representatives of Davis Polk subsequently conveyed to representatives of Latham that TPG would not be willing to proceed with a transaction on the terms set forth in the April 17 TPG Bid if the Merger Agreement included a go-shop provision.

69. On April 29, 2025, TPG and Corpay submitted a non-binding proposal for Avid of $10.00 per share in cash (the "April 29 Proposal"). In the April 29 Proposal, TPG and Corpay indicated that the proposal was their "best and final" offer and that they expected to finance the

transaction with a combination of new equity from TPG, an equity commitment of $642 million from Corpay, an equity rollover from management, an equity rollover from Institutional Stockholder and third-party debt financing. TPG and Corpay indicated that the terms of their partnership were being finalized. In the April 29 Proposal, TPG and Corpay indicated that they were confident that they would be in a position to sign the transaction by May 5 to 6, 2025.

70.    On April 30, 2025, a representative of Latham then provided a summary of the most recent draft of the Merger Agreement. Among other issues, and after further discussion with its advisors, the Board agreed to drop the request for a go-shop period given the inbound inquiries received by Avid, including following reports on March 13, 2025, that Avid was considering a possible sale, Avid's outreach to a number of third parties over the past several months and customary exceptions to Avid's no-solicitation obligations in the Merger Agreement.

71.    Later on April 30, 2025, representatives of Latham shared a revised draft of the Merger Agreement with Davis Polk.

72.    On May 1, 2025, the Board held a special meeting at which members of Avid management and representatives of Latham, Barclays and FT Partners were present. A representative of Latham provided an overview of the status of the transaction documents, indicating that regulatory matters remained the primary open point in the Merger Agreement, and confirming that TPG and Corpay would not require any voting and support agreement or equity rollover agreement from Institutional Stockholder prior to signing. Representatives of Avid management and FT Partners then exited the meeting.

73.    On May 3, 2025, the Board held a special meeting at which members of Avid management and representatives of Latham, Barclays and FT Partners were present. A representative of Latham provided an update on the status of the transaction documents. Later on

21

May 3, 2025, representatives of Davis Polk shared a revised draft of the Merger Agreement with Latham.

74. On May 4, 2025, the Board held a special meeting at which members of Avid management and representatives of Latham, Barclays and FT Partners were present. Representatives of Latham presented on regulatory risk in connection with the potential transaction as well as the remaining open issues in Davis Polk's markup of the Merger Agreement, which primarily related to the size of termination fees.

75. Later on May 4, 2025, representatives of Latham shared a revised draft of the Merger Agreement with Davis Polk.

76. On May 5, 2025, representatives of Davis Polk shared a revised draft of the Merger Agreement with Latham.

77. Later on May 5, 2025, the Board held a special meeting at which members of Avid management and representatives of Latham, Barclays and FT Partners were present. A representative of Latham discussed the open issues in Davis Polk's markup of the Merger Agreement, including with respect to termination fees.

78. Representatives of Latham and Davis Polk continued to exchange drafts of the Merger Agreement and applicable transaction documents on May 5, 2025, and May 6, 2025.

79. On May 6, 2025, the Board held a special meeting at which the General Counsel of Avid and representatives of Latham and Barclays were present. Members of Avid management and representatives of FT Partners did not join the meeting. A representative of Latham again advised the Board on their fiduciary duties with respect to a possible transaction and provided a summary of the proposed Merger Agreement, including provisions restricting Avid and its representatives from soliciting competing offers, provisions requiring the parties to take certain

actions with respect to obtaining regulatory and money transfer approvals for the Merger and provisions restricting Avid's conduct of business between the execution of the Merger Agreement and the closing of the transaction.

80.     Barclays then reviewed its financial analyses presented to the Board the previous day. Following such discussion, Barclays delivered to the Board its opinion ("Fairness Opinion") that, as of the date of such opinion, the Merger Consideration was fair, from a financial point of view, to Avid shareholders.

81.     Following further discussion, the Board, by the unanimous vote of the directors (other than Defendants Praeger, who did not join the Board meeting and recused himself from the Board's vote), determined that the Merger Agreement and the Transaction were fair to, advisable and in the best interests of Avid and its stockholders; approved the execution, delivery and performance of the Merger Agreement and the Transaction; and resolved to recommend the adoption of the Merger Agreement by Avid stockholders. Following the meeting of the Board, representatives of Latham and Davis Polk finalized the Merger Agreement and other transaction documents, and the Merger Agreement and other transaction documents were executed by the parties.

82.     On May 6, 2025, after the close of stock market trading, the parties issued a joint press release announcing the Transaction.

83.     On June 17, 2025, Avid filed the Proxy. As alleged further below, the Proxy contains materially misleading statements, and omissions that render statements therein materially misleading.

23

**Latham's Past and Current Representations of TPG**

84.     Latham served as legal advisor to the Board and the Transaction Committee in connection with the negotiation of the proposed sale of Avid to TPG and Corpay. In that capacity, Latham directly negotiated the terms of the Merger Agreement with Davis Polk.

85.     Among the Latham partners representing Avid in connection with the Transaction were (i) Ghaith Mahmood ("Mahmood") with respect to intellectual property matters; (ii) Robert Blamires ("Blamires") with respect to data privacy matters; and (iii) Andrew Galdes ("Galdes") with respect to sanctions matters.

86.     The Proxy discloses the conflicts of FT Partners, but fails to disclose that Latham also had a conflict based on its numerous past and concurrent representations of TPG within the two-year period prior to the announcement of the Transaction on May 6, 2025 ("TPG Representations"), which is the timeframe used by the Proxy as the benchmark for disclosing conflicting engagements. *See* Proxy at 68-69, 75.[3]

**Concurrent TPG Representations**

87.     As noted above, TPG had (i) first explored a possible investment in Avid in 2020, (ii) discussed Avid's performance with certain members of Avid management from time to time after Avid's IPO in October 2021, and (iii) as of December 18, 2024, had already met with members of Avid management to discuss a potential transaction with Avid after the Board launched the strategic review process in September 2024 (and by that time, had already apparently signed a confidentiality agreement with Avid).

---

[3] Specifically, the Proxy fully discloses the investment banking and financial services that Barclays provided to TPG and Corpay during the two years prior to the Fairness Opinion. *See* Proxy at pages 68-69.

88.    As also noted above, Latham began representing Avid with respect to a strategic review process on September 24, 2024. As of that date, through the announcement of the Transaction on May 6, 2025, Latham had been engaged by TPG for the following *four* undisclosed *concurrent* representations:

- On June 26, 2025, Latham announced that it had represented TPG and its portfolio company DOC Pharma, a leading Italian generic pharmaceutical company, on a Euro ("€") 990 million senior secured notes offering, composed of €400 million aggregate principal amount of senior secured floating rate notes due 2032 and €590 million aggregate principal amount of 5.625% senior secured notes due 2032, and on a €150 million multi-currency revolving credit facility to refinance existing indebtedness;

- On May 16, 2025, Latham announced that it had represented TPG Rise Climate (the dedicated climate investing platform of TPG) in connection with TPG entering into a binding agreement to acquire (together with Rebasissance Partners) a controlling stake in SICIT Group S.p.A, a global leader in the production of biostimulants;[4]

- On December 6, 2024, Latham announced that it had represented TPG in connection with its investment in Veeam Software via a $2 billion secondary offering that valued the company at $15 billion, with Galdes serving on Latham's team with respect to sanctions and export control matters; and

- On October 21, 2024, Latham announced that it had represented TGP in connection with its acquisition of Grandview, a leading Hollywood literary management firm, which TPG will combine with Untitled Entertainment (a company in which TPG previously invested in June 2024; *see infra*), with Blamires serving on the Latham team with respect to data privacy matters, and Mahmood serving on the team with respect to intellectual property matters.

**Past TPG Representations**

89.    Prior to September 24, 2024, Latham represented TPG in the following *four* undisclosed transactions in 2024 alone (i.e., less than two years prior to the announcement of the Transaction):

- On June 28, 2024, Latham announced that it had represented TPG in connection with the (i) formation of a new company that will acquire, invest in, and build a diversified global business centered on talent management, representation, and

---

[4] On March 6, 2023, Latham announced that it had represented TPG Climate in connection with a $150 million investment in Palmetto (a leading technology enabled clean energy platform).

25

adjacent verticals, and (ii) investment by such new company in Untitled Entertainment, a leading Hollywood talent management business with a 25-year track record representing many of the entertainment industry's most successful and celebrated talents, with Blamires serving on the Latham team with respect to data privacy matters, and Mahmood serving on the team with respect to intellectual property matters;

- On June 20, 2024, Latham announced that it had represented TPG in connection with its investment in K2 Medical Research, an integrated clinical trial site platform specializing in central nervous system trials for leading pharma and biotech sponsors;

- On March 19, 2024, Latham announced that it had represented TPG in connection with the sale of all its shares in Singapore Life Holdings Pte Ltd. ("Singlife"), to one of Singlife's substantial shareholders, Sumitomo Life Insurance Company (Sumitomo Life), in a deal that valued Singlife at SGD 4.6 billion, making it one of the largest insurance deals in Southeast Asia to date; and

- On January 24, 2024, Latham announced that it had represented TPG in connection with a significant strategic investment in Compass Surgical Partners, an independent full-service ambulatory surgery center (ASC) development and management partner.

**The Proxy's Failure to Disclose the TPG Representations Renders Statements in the Proxy Materially Misleading**

90.     Defendants disseminated a false and misleading Proxy to Avid stockholders that omits material information that render statements in the Proxy misleading, and thus deprives Plaintiff and other Avid stockholders of their right to cast fully informed votes with respect to the Transaction. Specifically, the Proxy's failure to disclose TPG Representations renders at least two statements in the Proxy misleading.

91.     *First*, the Proxy states at page 41:

On December 30, 2024, the Transaction Committee held a meeting, during which the General Counsel of the Company and representatives of Latham were present. At the meeting, the Transaction Committee discussed certain relationships and potential issues involving FT Partners and Mr. McLaughlin, including FT Partners' and Mr. McLaughlin's long-standing relationship with the Company and Company management, the significant ownership stake in the Company beneficially owned by Mr. McLaughlin, the significant fee that would be payable to FT Partners upon the consummation of a strategic transaction involving the Company, the employment by affiliates of Mr. McLaughlin of a family member of Mr. Praeger's and that the engagement letter between the Company and FT Partners did not

26

provide that FT Partners would render a fairness opinion in connection with a strategic transaction involving the Company, and discussed with representatives of Latham the advisability of engaging a co-lead financial advisor to provide strategic advice and render a fairness opinion in a possible transaction in light of these potential relationships and issues. The Transaction Committee determined to consider the matter further at a subsequent meeting.

92.    The failure to disclose Latham's TPG Representations renders the paragraph above misleading because the paragraph suggests that the only advisor conflicts requiring mitigation were the conflicts posed by FT Partners' long-term relationship with Avid, the significant ownership stake of entities controlled by Mr. McLaughlin in Avid, and the significant fee to be paid to FT Partners upon the consummation of the Transaction. But Latham's TPG Representations—especially Latham's *concurrent* representations of TPG while it was simultaneously representing Avid *against* TPG—also posed a conflict that should have been mitigated, and disclosed to Avid shareholders to enable them to cast informed votes. As a result of the failure to disclose the TPG Representations, the Proxy's disclosures concerning advisor conflicts are neither clear nor complete, and leave Avid shareholders in the dark concerning a conflict affecting Latham, the law firm that actively participated in the evaluation and negotiation of the Transaction, including the negotiation of the Merger Agreement.

93.    *Second*, the Proxy states at page 54 that "[i]n recommending that the Company stockholders vote their shares of Company Common Stock in favor of the Merger Proposal, the Board considered a number of factors, including the following material factors that supported the Board's determination and recommendation." Thereafter, at page 56, the Proxy states that one of the factors supporting the Board's recommendation was "the course and nature of negotiations with [TPG and Corpay], which were conducted at arm's length and ***during which the Transaction Committee and the Board were advised by financial advisors and legal counsel***."

27

94.     The failure to disclose Latham's TPG Representations renders the statement above misleading because the statement indicates that Latham's representation of the Transaction Committee and the Board was a *positive* factor supporting approval of the Transaction. But in fact, unbeknownst to Avid shareholders, Latham had an undisclosed conflict from its representations of TPG that would have plausibly diminished the vigor of its advocacy, which is a negative factor. Without also disclosing the TPG Representations, Avid shareholders are misled into concluding that Latham's representation of the Board and Transaction Committee was an entirely positive factor when, in fact, there are also undisclosed negative considerations. In contrast, the Proxy fully discloses the potential conflicts affecting Barclays (*see supra* note 3), thereby allowing Avid shareholders to weigh the significance of those conflicts when deciding how to vote.

95.     Disclosure of Latham's TPG Representations would substantially alter the total mix of information made available to Avid shareholders when deciding how to vote by making them aware of a conflict that could have plausibly affected Latham's judgment, and diminished the vigor of Latham's advocacy on behalf of Avid.

96.     Disclosure of Latham's TPG Representations would enable Avid shareholders to decide for themselves how much significance to assign Latham's conflicts when deciding how to vote.

**The Proxy Fails to Disclose Material Facts Underlying Barclays' Fairness Opinion Analyses**

97.     A financial advisor's fairness opinion is one of the most important process-based underpinnings of a board's recommendation of a transaction to its stockholders. Descriptions of the valuation analyses underlying fairness opinions must disclose key inputs and assumptions.

98.     Here, the Proxy omits certain material information concerning the analyses underlying Barclays' Fairness Opinion. As a result of these material omissions, Avid stockholders are unable to determine what weight to place on the Fairness Opinion in determining whether to

28

vote for the Transaction. The omitted information, if disclosed, would significantly alter the total mix of information available to Avid stockholders with respect to the Transaction

*Selected Comparable Companies Analysis*

99.    With respect to Barclays' Selected Comparable Companies Analysis, the Proxy fails to disclose the enterprise value ("EV") of any of the purportedly comparable companies included in the analysis. This omission is material because it prevents Avid stockholders from being able to fully evaluate the extent to which the companies selected for the analysis are comparable to Avid.

100.    Additionally, the Proxy fails to disclose the individual multiples of EV to (i) estimated calendar years 2025 and 2026 revenue, and (ii) estimated calendar years 2025 and 2026 Adjusted EBITDA, for any of the purportedly comparable companies, and instead simply provides low, high, mean and median multiples for EV/CY25E Revenue, EV/CY26E Revenue, EV/CY25E Adjusted EBITDA, and EV/CY26E Adjusted EBITDA. This omission is material because the Proxy advises that Barclays "selected a range of EV/revenue multiples of 3.0x to 6.0x for CY25E and 2.5x to 5.0x for CY26E, and a range of EV/Adjusted EBITDA multiples of 13.0x to 18.0x for CY25E and 11.0x to 15.0x for CY26E," and "applied such multiple ranges to the Company's estimated revenue and Adjusted EBITDA (inclusive of public company costs) for such calendar years as included in the Risk-Adjusted Forecasts in order to calculate a range of implied equity values per share of Company Common Stock on a fully diluted basis." But Avid stockholders cannot fully determine whether the multiple ranges used were appropriate without knowing the multiples for each of the purportedly comparable companies in the analysis.

101.    Finally, the Proxy fails to disclose the adjustments made to the implied enterprise values for Avid generated by applying the above multiple ranges to Avid's estimated revenue and

Adjusted EBITDA to derive the implied equity value per share ranges disclosed at page 63 of the Proxy.

*Selected Precedent Transactions Analysis*

102.    With respect to Barclays's Selected Precedent Transactions Analysis, the Proxy fails to disclose the EV of any of the purportedly comparable target companies included in the analysis. This omission is material because it prevents Avid stockholders from being able to fully evaluate the extent to which the target companies selected for the analysis are comparable to Avid.

103.    Additionally, the Proxy fails to disclose the multiple of EV to last-twelve-months ("LTM ") revenue, forward 12-month ("NTM") revenue, EV/LTM Revenue (Growth <20%), and EV/NTM Revenue (Growth <20%) for any of the purportedly comparable target companies, and instead simply provides mean and median multiples for EV/LTM Revenue (All), EV/NTM Revenue (All), EV/LTM Revenue (Growth <20%), and EV/NTM Revenue (Growth <20%). This omission is material because the Proxy advises that Barclays "selected a range of EV/LTM revenue multiples of 5.0x to 7.5x and a range of EV/NTM revenue multiples of 4.0x to 6.5x," and "applied such multiple ranges to the Company's actual LTM revenue as of March 31, 2025 ("Q1'25 LTM")" and the Company's projected NTM revenue as of March 31, 2025 as included in the Risk-Adjusted Forecasts ("Q1'25 NTM") in order to calculate a range of implied equity values per share of Company Common Stock on a fully diluted basis." But Avid stockholders cannot fully determine whether the multiple ranges used were appropriate without knowing the multiples for each of the purportedly comparable target companies in the analysis.

104.    Finally, the Proxy fails to disclose the adjustments made to the implied enterprise values for Avid generated by applying the above multiple ranges to Avid's Q1'25 LTM and Q1'25 NTM to derive the implied equity value per share ranges disclosed at page 64 of the Proxy.

30

## CLASS ACTION ALLEGATIONS

105.    Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of all individuals and entities that are Avid stockholders (the "Class") as of the date hereof ("Class Period"). Excluded from the Class are: (i) Defendants and members of their immediate families; (ii) the officers and directors of Avid and members of their immediate families; and (iii) any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

106.    Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

107.    The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, the Proxy discloses that 206,238,144 Avid shares were issued and outstanding as of April 28, 2025.

108.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws, as specified above.

109.    Plaintiff will fairly and adequately protect the interests of the Class, and has no interests antagonistic to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in securities class action litigation of this nature.

110.    Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*, whether (i) Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder; (ii) the Individual

Defendants have violated Section 20(a) of the Exchange Act; and (iii) Plaintiff and the other members of the Class are entitled to injunctive relief.

111. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

112. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## CLAIMS FOR RELIEF

## COUNT I

**Against All Defendants**
**for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

113. Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

114. SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any Proxy, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

115. Defendants disseminated a false and misleading Proxy, which made statements that are false and misleading, and omitted material facts necessary in order to make the statements

32

made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

116. By virtue of their positions within Avid, and/or roles in the process of preparing, reviewing, and/or disseminating the Proxy, Defendants were aware of their duty not to make false and misleading statements in the Proxy, and not to omit material facts from the Proxy necessary to make statements made therein—in light of the circumstances under which they were made—not misleading.

117. Yet, as specified above, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, Defendants (i) made untrue statements of material fact in the Proxy, and/or (ii) omitted material facts from the Proxy necessary to make statements therein— in light of the circumstances under which they were made—not misleading, in order to induce Avid stockholders to vote in favor of the Transaction. Defendants were at least negligent in filing the Proxy with materially false and misleading statements and omissions.

118. The material misrepresentations and omissions in the Proxy specified above are material insofar as a reasonable Avid Stockholder would view disclosure of the omitted facts specified above as significantly altering the "total mix" of information made available to Avid stockholders.

119. Since, according to the Proxy, the "affirmative vote of the holders of at least a majority of the shares of Company Common Stock outstanding and entitled to vote in accordance with the DGCL is required to approve" the Transaction, the Proxy soliciting the votes of Avid stockholders is an essential link in the accomplishment of the Transaction. Thus, causation is established.

120. Plaintiff and other Avid stockholders have no adequate remedy at law, and are

threatened with irreparable harm insofar as Plaintiff and other Avid stockholders will be deprived of their entitlement to cast fully informed votes with respect to the Transaction if such material misrepresentations and omissions are not corrected before the Stockholder Vote. Therefore, injunctive relief is appropriate.

## COUNT II

**Against the Individual Defendants for**
**Violations of Section 20(a) of the Exchange Act**

121.    Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

122.    The Individual Defendants acted as controlling persons of Avid within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By virtue of their positions as officers and/or directors of Avid, and participation in, and/or awareness of the negotiation of the Transaction, and/or intimate knowledge of the contents of the Proxy filed with the SEC in order to solicit the votes of Avid stockholders to vote in favor the Transaction, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Avid with respect to the Proxy, including the content and dissemination of the various statements in the Proxy that are materially false and misleading, and the omission of material facts specified above.

123.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements that were false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

124.    Each of the Individual Defendants had direct and supervisory involvement in the negotiation and approval of the Transaction, and, therefore, is presumed to have had the power to

control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised same.

125.    By virtue of the foregoing, the Individual Defendants had the ability to exercise control over and did control a person or persons who violated Section 14(a), by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.

126.    Plaintiff and other Avid stockholders have no adequate remedy at law, and as a result of the Individual Defendants' violations of Section 20(a) of the Exchange Act, are threatened with irreparable harm by virtue of being deprived of their entitlement to cast fully informed votes with respect to the Transaction. Therefore, injunctive relief is appropriate.

## COUNT III

### Against the Individual Defendants for
### Breaches of Fiduciary Duty Under Delaware Law

127.    Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

128.    By virtue of their role as directors and/or officers of Avid, the Individual Defendants owe Plaintiff and all Avid shareholders fiduciary duties under Delaware law requiring them to disclose fully and fairly all material information within their control when they seek shareholder action, and to ensure that the Proxy did not omit any material information or contain any materially misleading statements.

129.    As alleged herein, the Individual Defendants breached their fiduciary duties by approving or causing the materially deficient Proxy to be disseminated to Plaintiff and Avid's other public shareholders.

130.    The misrepresentations and omissions in the Proxy are material, and deprive Plaintiff

and other Avid shareholders of their right to cast informed votes with respect to the Transaction.

131.   Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict if the material misrepresentations and omissions alleged herein are not corrected prior to the Stockholder Vote.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure; appointing Plaintiff as the Class Plaintiff; and appointing Plaintiff's counsel as Class Counsel;

B.   Enjoining Defendants and their counsel, employees and all other agents and persons acting in concert with them from proceeding with and holding the Stockholder Vote and consummating the Transaction, unless and until Defendants disclose and disseminate to Avid stockholders the material information specified above that has been omitted from the Proxy, and correct any false and misleading statements in the Proxy;

C.   Finding Defendants liable for violating Sections 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

D.   Finding the Individual Defendants liable for violating Section 20(a) of the Exchange Act;

E.   Finding that the Individual Defendants breached their fiduciary duties under Delaware law;

36

F.      Rescinding, to the extent already implemented, the Merger Agreement or any of the transactions contemplated thereby, or granting Plaintiff and other Avid stockholders rescissory damages;

G.      Directing Defendants to account to Plaintiff and other Avid stockholders for all damages suffered as a result of their misconduct;

H.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees and expenses; and

I.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: July 11, 2025                                    Respectfully submitted,

                                                        By: */s/ Juan E. Monterverde*

                                                        Juan E. Monteverde (JM8169)
                                                        **MONTEVERDE & ASSOCIATES PC**
                                                        The Empire State Building
                                                        350 Fifth Avenue, Suite 4740
                                                        New York, New York 10118
                                                        Tel: 212-971-1341
                                                        Fax: 212-202-7880
                                                        jmonteverde@monteverdelaw.com

                                                        Joshua E. Fruchter
                                                        **WOHL & FRUCHTER LLP**
                                                        25 Robert Pitt Drive, Suite 209G
                                                        Monsey, NY 10952
                                                        Tel. (845) 290-6818
                                                        Fax. (718) 504-3773
                                                        jfruchter@wohlfruchter.com

                                                        *Attorneys for Plaintiff and the Proposed Class*