UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH ZAPPIA, *Individually and on Behalf of All Others Similarly Situated*,

Plaintiff,

*– against –*

AVIDXCHANGE HOLDINGS, INC., MICHAEL PRAEGER, JAMES HAUSMAN, J. MICHAEL MCGUIRE, TERESA MACKINTOSH, LANCE DRUMMOND, ASIF RAMJI, ONI CHUKWU, *and* A.J. RUBADO,

Defendants.

**OPINION & ORDER**

1:25-cv-05727 (ER)

RAMOS, D.J.:

Joseph Zappia, an AvidXchange Holdings, Inc. ("AvidXchange") shareholder, brings this motion against defendants AvidXchange and its board members: Michael Praeger, James Hausman, J. Michael McGuire, Teresa Mackintosh, Lance Drummond, Asif Ramji, Sonali Sambhus, Oni Chukwu, and A.J. Rubado (collectively with AvidXchange, the "Defendants") for an award of reasonable attorneys' fees and expenses for conferring a substantial benefit on AvidXchange stockholders pursuant to federal and Delaware law. Doc. 52, 53.

For the reasons set forth below, the motion is DENIED.

## I. BACKGROUND

The following facts have been taken from the amended complaint, Doc. 8; Zappia's memorandum in support of his motion for attorney fees, Doc. 52; the declaration of Juan E. Monteverde, counsel for Zappia, in support of the motion, Doc. 54; Defendants' memorandum in opposition to the motion, Doc. 56; the declaration of Blair G. Connelly, counsel for the Defendants, Doc. 57; and the exhibits attached therein. The facts are uncontested unless noted otherwise.

AvidXchange is a company incorporated in Delaware that provides accounts payable software and payment automation solutions for over 8,500 businesses and their suppliers. Doc. 56 at 6. At all relevant times, Praeger served as president and chief executive officer (CEO) of AvidXchange as well as chairman of the board, and the remaining individual Defendants served as board members. Doc 8 ¶¶ 17–25.

TPG Global, LLC ("TPG"), had first explored investing in AvidXchange in 2020 prior to AvidXchange's initial public offering ("IPO"). *Id.* at ¶ 1. Following AvidXchange's IPO in October 2021, TPG would discuss performance with AvidXchange management from time to time. *Id.*

On September 24, 2024, Latham & Watkins LLP ("Latham") began representing AvidXchange in a strategic review process after it had received interest from acquirors regarding a potential sale. *Id.* at ¶¶ 30, 90. In preparation, over the following several months, AvidXchange created an independent Transaction Committee, which included two sets of financial advisors and Latham, to discuss a potential sale with ten potential buyers. *Id.* at ¶ 33.

Prior to Latham's representation of AvidXchange, it had represented TPG in four transactions in 2024. Doc. 8 ¶ 92. Different Latham partners then represented TPG in four additional, concurrent transactions that were unrelated to AvidXchange, between October 2024 and June 2025. *Id.* at ¶¶ 4, 91. Zappia alleges that these representations "would raise legitimate concerns for reasonable [AvidXchange] shareholders because those representations would have given Latham a powerful incentive to negotiate less aggressively against TPG" in the AvidXchange transaction. *Id. at* ¶ 93.

On January 15, 2025, representatives of the financial advisors shared an initial process letter with six potential counterparties: sponsor A, sponsor B, sponsor D, sponsor E, sponsor F and TPG. *Id.* ¶ 44. Two days later, the Transaction Committee held a meeting with AvidXchange management, Latham representatives, and the financial advisors to discuss the potential bids and due diligence processes. *Id.* ¶ 45. Latham

provided a summary of the draft merger agreement. *Id.* During another meeting held on February 3, 2025, Latham disclosed that it had historically and concurrently represented TPG, and sponsors A, B, C, D, E, and F, stating that while each sponsor was a client, none accounted for 1% or more of Latham's revenues over the last two years. *Id.* ¶ 50. Stockholders could readily ascertain from publicly available information, including on Latham's website, that Latham had represented TPG in the past. Docs. 56 at 6, 59 at 5.

Later that day, the board held a special meeting with Latham, the financial advisors, and AvidXchange management during which Latham again advised the board of its fiduciary duties in connection with their potential transaction and disclosed once again its client relationships with TPG and the other sponsors. Doc. 8 ¶ 51–52.

On April 26 and 27, 2025, Davis Polk & Wardwell ("Davis Polk"), legal counsel to TPG, shared revised drafts of the documents. *Id.* at ¶ 75. Two days later, TPG and Corpay, Inc. submitted a joint proposal to purchase AvidXchange. *Id.* at ¶ 76. TPG and Corpay's bid was the highest one available to AvidXchange and represented a 22% premium above the market trading price for AvidXchange's stockholders. Doc 56 at 5. After several meetings, AvidXchange's board, excluding its CEO who recused himself, decided that the TPG/Corpay offer was fair, advisable, and in the best interest of AvidXchange and its shareholders, ultimately recommending that stockholders vote in favor of the merger. Doc. 8 ¶ 88.

On May 6, 2025, after the markets closed, AvidXchange, TPG, and Corpay jointly announced the merger. *Id.* ¶ 89. The following day, Zappia's attorneys began investigating the transaction and Zappia purchased his first ten shares of AvidXchange, making him a stockholder of the company. Doc. 2 at 3. Zappia subsequently purchased ten more shares on May 21, 2025, and another ten on June 6, 2025, resulting in a total position of thirty shares acquired for a total of $290.40. *Id.* Defendants claim that this timing suggests that Zappia bought shares merely to bring a claim for attorney's fees, which is contrary to public policy. Doc. 56 at 16.

AvidXchange submitted its preliminary proxy statement ("Initial Proxy") with the Securities Exchange Commission ("SEC") on June 17, 2025. Doc. 8 ¶ 94. The Initial Proxy disclosed AvidXchange's two financial advisors' potential conflicts in connection with the sale but did not mention any conflicts related to Latham. *Id.* ¶ 95; Doc. 54-1.

Zappia initially filed the complaint on July 11, 2025, requesting disclosure of Latham's potential conflict of interest in advising AvidXchange's board while concurrently representing TPG in other transactions. Doc. 8 ¶ 4. Zappia alleges that failure to disclose that information in the Initial Proxy was misleading and in violation of the Securities Exchange Act, SEC Rule 14a-9, and fiduciary duties under Delaware law. *Id.* ¶ 1. Five days later, on July 16, 2025, the Defendants responded by filing their first amended proxy statement with the SEC disclosing Latham's potential conflicts but stating that none of the clients at-issue "accounted for 1% or more of Latham's revenues over the last two years." *Id.* ¶ 97–98; Doc. 54-2.

This elicited an amended complaint on July 21, 2025, alleging that the additional information did not cure the disclosure violation because "up to 1% of Latham's revenue" was too vague of a figure considering that Latham's "aggregate revenue in 2023 and 2024 was $12.7 billion." Doc. 8 ¶ 7. The next day, on July 22, 2025, Zappia filed a motion for preliminary injunction and expedited discovery, which he then withdrew on August 1, 2025, following the Defendants' representation that they would submit an amended proxy. Doc. 9; Doc. 34. The Defendants filed a second amended proxy statement with the SEC five days later, on August 6, 2025, disclosing that "[f]rom January 1, 2023, through May 6, 2025, the date of the execution of the Merger Agreement, Latham received fees in an aggregate amount of approximately $57.7 million from TPG." Doc. 54-3 at 3. The Defendants then submitted a final proxy statement (" Definitive Proxy") with the SEC on August 15, 2025, inviting stockholders to a special meeting to discuss the merger. Doc. 54-4. The vote was held on September 16, 2025, and AvidXchange

stockholders approved the sale. Doc. 53 at 18. Following the additional disclosures, the instant case became moot.

The motion before the Court is Zappia's motion for attorney fees, which he filed on September 26, 2025. Doc. 52. In his motion, Zappia argues that he should be awarded $750,000.00 in attorneys' fees because he conferred a common benefit upon AvidXchange stockholders by forcing AvidXchange to cure its materially misleading proxy statements through this litigation. Doc. 53 at 10–11.

## II. FEDERAL LAW

### A. Legal Standard

The general rule in the United States, known as the American rule, is that "attorney's fees are not ordinarily recoverable in the absence of a statute or enforceable contract." *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 717 (1967). Courts and Congress, however, have developed some exceptions to this rule. "The common-benefit rule permits a prevailing party to obtain reimbursement of attorneys' fees 'in cases where the litigation has conferred a substantial benefit on the members of an ascertainable class.'" *Amalgamated Clothing & Textile Workers Union v. Wal-Mart Stores, Inc.*, 54 F.3d 69, 71 (2d Cir. 1995) (quoting *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 393-94 (1970)). "This exception is premised on the equitable principle that 'persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense.'" *Id.* (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)). "This development has been most pronounced, in shareholders' derivative actions, where the courts increasingly have recognized that the expenses incurred by one shareholder in the vindication of a corporate right of action can be spread among all shareholders . . ." *Mills*, 396 U.S. at 394.

"Fees may be awarded even when there is no judgment on the merits or when the dispute has become moot because the relief sought is otherwise obtained." *Koppel v. Wien*, 743 F.2d 129, 135 (2d Cir. 1984) (citing *Lewis v. Anderson*, 692 F.2d 1267, 1270

(9th Cir. 1982)). "[B]efore awarding fees in a case that has become moot, the district court must determine whether plaintiff's suit was a substantial cause of the benefit obtained." *Belcher v. Volta Inc.*, 714 F. Supp. 3d 379, 384 (S.D.N.Y. 2024) (quoting *Savoie v. Merchants Bank*, 84 F.3d 52, 56-57 (2d Cir. 1996)).

"The plaintiff bears the burden of demonstrating a substantial benefit has been conferred [to the shareholders]" because of the additional disclosures achieved, as "[n]ot all corporate disclosures are *per se* substantially beneficial." *Topley v. SemGroup Corporation,* No. 19-cv-10412 (RA), 2021 WL 1172622, at *3-4 (S.D.N.Y. Mar. 29, 2021) (internal citations omitted). However, there is no additional requirement to show "that the complaint had sufficient merit to survive a motion to dismiss." *Id.* at *3 (citing *Savoie*, 84 F.3d at 57). "'Although the benefit need not be pecuniary, it 'must be something more than technical in its consequence and be one that accomplishes a result which . . . affect[s] the enjoyment or protection of an essential right to the stockholder's interest.'" *Amalgamated Clothing*, 54 F.3d at 71 (quoting *Mills*, 396 U.S. at 396). If "plaintiffs' lawsuit is mooted by defendants' corrective action, the burden properly shifts to defendants to establish the absence of a causal connection in order to defeat a claim for legal fees." *Koppel*, 743 F.2d at 135.

"[T]he right to cast an informed vote, in and of itself, is a substantial interest worthy of vindication," and litigation that broadens a group's voting rights, benefits all those eligible to vote. *Amalgamated Clothing*, 54 F.3d at 71. But "providing shareholders with *any* information," cannot automatically qualify as sufficiently "bolstering" to merit fees under a substantial shareholder benefit. *Topley*, 2021 WL 1172622, at *4.

In evaluating whether additions to a proxy statement allowed shareholders to cast an informed vote, and therefore bestowed a substantial benefit on those shareholders, courts regularly look to the requirements of securities laws. *See e.g.*, *Amalgamated Clothing*, 54 F.3d at 71–72. Under Rule 14a-9(a), "a misstatement or omission in a proxy

statement was material if 'the defect . . . might have been considered important by a reasonable shareholder who was in the process of deciding how to vote.'" *Broder v. Dane*, 384 F. Supp. 1312, 1320 (S.D.N.Y. 1974) (quoting *Mills*, 396 U.S. at 384); *see also Beaumont v. American Can Co.*, 621 F. Supp. 484, 495 (S.D.N.Y. 1985, aff'd, 797 F.2d 79 (2d Cir. 1986)) ("Under [Rule 14a-9(a)], an omitted fact is material if it 'would have assumed actual significance in the deliberations of the reasonable shareholder.'" (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976))).

For an omission to be material in the context of a vote under Rule 14a-9, the Supreme Court held that "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries, Inc.*, 426 U.S. at 449. The Second Circuit further defined a material fact as one that "need not be outcome-determinative; that is, it need not be important enough that it 'would have caused the reasonable investor to change his vote.' Rather, the information need only be important enough that it 'would have assumed actual significance in the deliberations of the reasonable shareholder.'" *Folger Adam Co. v. PMI Industries, Inc.*, 938 F.2d 1529, 1533 (2d Cir. 1991) (quoting *TSC Industries, Inc.*, 426 U.S. at 449).

"[A]s a general matter, the 'total mix of information may include information already in the public domain and facts known or reasonably available to potential investors.' But case law does not support the sweeping proposition that an issuer of securities is *never* required to disclose publicly available information." *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 718 (2d Cir. 2011) (emphasis added) (internal citations omitted) (quoting *United Paperworks International Union v. International Paper Co*., 985 F.2d 1190, 1199 (2d Cir. 1993)).

**B. Discussion**

Zappia argues that he is entitled to $750,000 in attorneys' fees and expenses because he conferred a substantial benefit to the stockholders of AvidXchange under the

"common benefit doctrine" by forcing AvidXchange to disclose Latham's relationship with TPG and the fees associated with that relationship, thereby enabling stockholders to cast fully informed votes. Doc. 53 at 10, 20, 25 ("[R]easonable AvidXchange stockholders would deem it important to know—when deciding how to vote—that Latham had a longstanding and lucrative relationship with TPG, which could be perceived to have adversely affected the vigor of Latham's advocacy when negotiation on AvidXchange's behalf"). Zappia also argues that Defendants cannot meet their burden to disprove that the additional disclosures were causally tied to Zappia's litigation efforts. *Id.* at 24.

Defendants do not contest that their supplemental proxy statements were causally related to Zappia's litigation but rather argue that the supplemental disclosures did not confer substantial benefits on stockholders and that Zappia's "rent-seeking" litigation should not be rewarded with fees. *See* Doc. 56 at 17 ("Rewarding Plaintiff's counsel for generating immaterial disclosures would undermine judicial efforts to curb frivolous merger litigation and invite more of the same"). Further Defendants allege that Zappia "regularly follows the same basic playbook—file a complaint and injunction motion, force the target company to issue supplemental disclosures, and subsequently withdraw the motion." *Id*. at 9 (citing Doc. 31-4; *Zappia v. Morphic Holding, Inc. et al.*, No. 3:24-cv-04486 (JD) (N.D. Cal. filed July 25, 2024); *Zappia v. Gan Ltd., et al.*, No. 24-cv-00032 (JPC) (S.D.N.Y. filed Jan. 3, 2024)).

1. *The disclosure of Latham's potential conflict of interest did not confer a substantial benefit on AvidXchange's shareholders deserving attorneys' fees.*

Zappia first argues that the Defendants' initial proxy was materially misleading because, by disclosing "the conflicts of AvidXchange's financial advisors," but not including Latham's conflicts, the Defendants "create[ed] the misimpression that those conflicts were the only advisor conflicts that mattered and required disclosure." Doc. 53 at 7. Zappia claims that "[t]he conflicts of sell-side law firms are material and must be

disclosed if they 'might be perceived to affect' the advocacy of such firms when representing selling shareholders in a corporate transaction. Doc. 53 at 23 (citing *Wilson v. Great American Industries, Inc.*, 855 F.2d 987 (2d Cir. 1988)).

While courts have held that proxies must disclose conflicts relating to investment banks serving as financial advisors, *see e.g. Berkman v. Rust Craft Greeting Cards, Inc.*, 454 F. Supp. 787 (S.D.N.Y. 1978) (holding that failure to disclose to the board of a company that its financial adviser had purchased shares of the company was a material omission), Zappia fails to demonstrate that potential conflicts of law firms serving as legal counsel, must also be disclosed in a proxy statement. The parties do not cite, and the Court has not found, any federal case in which a proxy statement has been found to be materially misleading by *only* failing to disclose a law firm's conflict of interest.

The only federal case that Zappia relies on involving a law firm's conflict of interest is *Wilson*.[1] But in *Wilson*, the Second Circuit evaluated whether five omissions, including one relating to the legal advisor's conflicts, were material such that the joint proxy statement submitted by the two merging companies, Chenango and GAI, became materially misleading. *Wilson*, 855 F.2d 987. First was an omission concerning a decision in another case that found GAI liable for $990,000 for fraudulently tampering with an appraisal of its subsidiary to avoid paying union obligations. *Id.* at 992 (citing *United Rubber, Cork, Linoleum and Plastic Workers of America v. Great American Industries, Inc.*, 479 F. Supp. 216, 245 (S.D.N.Y. 1979)). Second was that GAI was in the process of taking a $1.8 million loan. *Id.* at 992–93. Third was that the proxy statement misrepresented the worth of a federally subsidized housing project that Chenango had owned and operated for fourteen years. *Id.* at 994. Fourth was that the proxy overstated the value of one of GAI's subsidiaries. *Id.* at 994–95. Finally, the law advisor conflict involved the longstanding relationship between Dyer, who was a shareholder, director,

[1] Zappia cites Delaware cases to support this proposition. Those cases are examined below.

secretary, and general counsel of Chenango, and Koffman, who was the president and chairman of GAI's board of directors. *Id.* at 993. Dryer had personally represented several of Koffman's family members and his firm had represented more than a dozen entities controlled by the Koffmans over a number of decades.

Zappia focuses on the law advisor disclosure, concerning the longstanding relationship between Dyer and Koffman. Doc. 53 at 23. In evaluating the relationship, the *Wilson* court noted that "the relevant inquiry is not whether an actual conflict of interest existed, but rather whether full disclosure of potential conflicts of interest has been made." *Wilson*, 855 F.2d at 994. The court held that "[c]onsidering [Dyer]'s status as the shareholders' counsel and as a director recommending the merger, Dyer's long-standing business relationship with the Koffmans should have been disclosed." *Id*. Dyer was a partner at a law firm while also serving as secretary and general counsel to Chenango. *Id.* at 993. He had personally represented three Koffmans, and his firm had represented "more than one dozen entities controlled by the Koffmans" for over fifty years prior to this merger. *Id.* at 994. "The omission proven here deprived the Chenango shareholders of the opportunity to judge for themselves what significance to attribute to Dyer's representation of the Koffmans." *Id*.

The conflicts in *Wilson* were much more extensive than those at issue here. The situation here is different because no AvidXchange board member is also a Latham partner that has represented TPG-related entities for over fifty years. Further, the *Wilson* court was evaluating four additional omissions including one involving fraud. *Id.* at 990, 992. The court thus concluded that "*the five omissions and misrepresentations* . . . rendered the proxy statement materially misleading." *Id.* at 991 (emphasis added).[2]

[2] Zappia also relies on *Mills*, *Amalgamated Clothing*, and *Koppel* as examples of where shareholders substantially benefitted from plaintiffs' litigation efforts. Doc. 53 at 20. In *Mills*, the Supreme Court found that the proxy statement was materially misleading because it told shareholders that "their board of directors recommended approval of the merger without also informing them that all 11 . . . directors were nominees of [the company they were merging with]" and were under that company's control. *Mills*, 396 U.S. at 378. In this case, Zappia states that Latham "advised the board on their fiduciary duties with respect to a possible transaction" after which their financial advisor "reviewed its financial analyses and delivered

Even if Zappia had shown that Latham's conflicts in this case were material, Zappia fails to demonstrate that disclosure of Latham's representation altered the "total mix" of information available to shareholders because the relationship was already public.

Defendants argue that because Latham's relationship with TPG was already public, the Court should follow other district courts that have found disclosure of such information immaterial. Doc. 56 at 12 (citing *Zappia v. Myovant Sciences Ltd.*, 708 F. Supp. 3d 486 (S.D.N.Y. 2023)).[3] In *Myovant Sciences*, the plaintiff, also Zappia, alleged that a company's proxy statement should have disclosed the fact that the law firm representing the company was concurrently representing a bank which financed the merger as well as entities affiliated with the merging company. *Myovant Sciences*, 708 F. Supp. 3d at 491. The court found that despite the fact that the proxy statement explicitly stated that the law firm had an "absence of conflicts" and was "independent," the disclosure was not material because the plaintiff did "not allege that [the law firm] has ever represented [the merging company], the actual counterparty in the merger transaction, or its corporate parent." *Id.* at 491. However, the court went on to say:

its fairness opinion." Doc. 53 at 15. This financial advisor's subsequent verification maintains the independence and credibility of the board's recommendation.

Next, in *Amalgamated Clothing*, the Second Circuit held that the plaintiffs had conferred a "substantial benefit" to Wal-Mart's shareholders by successfully litigating to have the union's proposal included in the proxy materials after Wal-Mart had rejected the proposal the prior year. *Amalgamated Clothing*, 54 F.3d at 71–72. The court there found that the plaintiff had conferred a substantial benefit on stockholders because "the promotion of corporate suffrage regarding a significant policy issue confers a substantial benefit regardless of the percentage of votes cast for or against the proposal at issue." *Id*. at 71. In this case, Zappia is not enabling a group of employees to be heard nor is he arguing that there is a significant policy concern at issue, making this "substantial benefit" claim very different from the one in *Amalgamated*.

Similarly in *Koppel*, the claim was successful because the plaintiff was able to prevent a proposal that, if approved, would have diluted the economic value of the real estate investors' ownership rights by approximately 13.5% . *Koppel*, 743 F.2d at 131, 133. By preventing that proposal from taking effect, the Second Circuit found that the plaintiff had conferred a clear benefit to the investors by preserving the value of their investment. *Id*. The Second Circuit did note that a substantial benefit could still be established in the "absence of a tangible monetary benefit"; however, it did not extensively discuss the matter, as there was a monetary benefit in *Koppel*. This is materially different to the situation at hand.

[3] Zappia discusses *Myovant Sciences* but urges the Court not to follow it. Doc. 59 at 7.

> even if the [c]ourt were to accept as true the assertion that [the law firm] in some sense had a conflict of interest, a reasonable investor would not have found the proxy statement to be materially misleading in light of other public information. The Amended Complaint nowhere alleges that [the law firm's] representation of [allegedly conflicting businesses] was kept secret or was unknown to the public at the time of the proxy statement. Indeed, Zappia was himself aware of that information—and was able to allege it in the Amended Complaint—precisely because it was reasonably available to the public.

*Id.* at 491. To be sure, while the instant case is comparable, it differs from *Myovant Sciences* in that here Latham *is* alleged to have represented TPG, the counterparty to the merger. However, like in *Myovant Sciences*, Latham's relationship with TPG was already public information, not buried or unlikely to be discovered, as it was published on Latham's website. Doc. 59 at 5. The Court finds this information to sufficiently be in the "public mix" already.

Zappia argues that not all public information is already a part of the "total mix" of information available to shareholders, and that each of Defendants' cited cases are inapposite. Doc. 59 at 6–10.

"[A]s a general matter, the 'total mix of information may . . . include information already in the public domain and facts known or reasonably available to potential investors.' . . . case law does not support the sweeping proposition that an issuer of securities is *never* required to disclose publicly available information." *Litwin*, 634 F.3d at 718 (emphasis added). For instance, in *United Paperworks*, the Second Circuit held that neither press reports published over the course of a year detailing the company's environmental criminal liability nor a 10-K form filed with the SEC but not delivered to shareholders would be considered a part of the "public mix." *United Paperworks*, 985 F.2d at 1198.

In deciding the issue, the Second Circuit stated that the while "'total mix' of information may include . . . other information 'reasonably available to shareholders'" in addition to the proxy itself, "information actually sent to shareholders need not be

considered part of the total mix reasonably available to them if 'the true' is 'buried' in unrelated discussions." *Id.* at 1198-99 (quoting *Rodman v. Grant* Foundation, 608 F.2d 64, 70 (2d Cir. 1979)). The Court held that "when the subject of a proxy solicitation has been widely reported in readily available media, shareholders may be deemed to have constructive notice of the facts reported, and the court may take this into consideration in determining whether representations in or omissions from the proxy statement are materially misleading*."* *Id*. However, "the mere presence in the media of sporadic news reports does not give shareholders sufficient notice that proxy solicitation statements sent directly to them by the company may be misleading." *Id.* at 1999.

Several courts in this District have found that where information regarding a law firm's clients is public, it is already a part of the "total mix" of information available to shareholders. *See e.g. Myovant Sciences*, 708 F. Supp. 3d at 494 (finding that even if the law firm at issue had "in some sense a conflict of interest, a reasonable investor would not have found the proxy statement to be materially misleading in light of other public information."); *see also Belcher*, 714 F. Supp. 3d at 386 (finding that, in the context of a financial advisor's potential conflict, the plaintiff "failed to achieve a substantial benefit for . . . shareholders for an independent reason: The supplemental disclosures did not include anything that was not already public information.").

*Belcher* similarly involved a request for attorneys' fees pursuant to the common benefit doctrine following additional disclosures made to rectify allegedly materially misleading proxy statements and breach of fiduciary duties during the acquisition process of two companies. *Belcher*, 714 F. Supp. 3d at 382. The case also became moot following defendants' additional disclosures after service of the complaint. *Id*. at 383. In that case, however, the conflict of interest was that of the financial advisors, not a law firm. *Id*. Even so, the court in that case denied the motion for attorneys' fees finding the disclosures to be immaterial, in part, because "[t]he supplemental disclosures did not include anything that was not already public information." *Id*. at 382 ("'Indeed [the

Plaintiff] was himself aware of that information—and was able to allege it in the complaint—precisely because it was reasonably available to the public.'" (internal citation omitted)).

The Court finds the facts of instant case more akin to *Myovant Sciences* and *Belcher*, than *United Paperwork*. Unlike the plaintiffs in *United Paperwork*, Zappia does not allege that the Defendants were "burying" information about their work with TPG, nor that they explicitly "conveyed [an] entirely false" impression through their claims, as the company in *United Paperworks* had. *See United Paperworks*, 985 F.2d at 1200. Therefore, the Court does not find that case comparable to the instant case.

On this issue, Zappia claims that neither *Myovant Sciences* nor *Belcher* are applicable because they are inconsistent with Second Circuit authority. Doc. 59 at 7–8. First, Zappia argues that *Myovant Sciences* is inconsistent because it holds that "public availability of information automatically renders nondisclosures of that information immaterial." *Id*. at 7 (emphasis added). The Court finds this reading of *Myovant Sciences* too broad. *Myovant Sciences*'s court found that the information in question was not kept secret, and was known to the public, which made its disclosure immaterial. *Myovant Sciences*, 708 F. Supp. 3d at 494. This is in line with *Litwin*, which states that as a "general matter, the 'total mix of information may . . . include information already in the public domain'" but also acknowledges that "case law does not support the sweeping proposition that an issuer of securities is never required to disclose publicly available information." *Litwin*, 634 F.3d at 718 (2d Cir. 2011) (citing caselaw finding that companies may be required to disclose public information about trends that could affect the company's business "in appropriate circumstances" or where the information was only present in "sporadic news reports"). The same applies to *Belcher*.

Zappia claims that *Belcher* is inconsistent because it holds that "publicly available information can never be material." Doc. 53 at 24 n.3. But *Belcher* says no such thing. The court in that case noted that the disclosures included public information that the

plaintiff was aware of and thus it did not alter the "total mix" of available information to make those disclosures material. *Belcher*, 714 F. Supp. 3d at 386.

Accordingly, the Court finds that disclosure of Latham's prior representation of TPG did not alter the "total mix" of information available to shareholders, and therefore Zappia has not conferred a substantial benefit by causing its disclosure.

Zappia's remaining arguments are unpersuasive. In its reply, Zappia points to that AvidXchange's inclusion of a warning to stockholders in their final proxy statement stating that they should "rely only on the information contained in this proxy statement, the annexes to this proxy statement and the documents we refer to in this proxy statement, to vote on the Merger," and argues that warning, "totally changes the relevant mix of information for assessing materiality." Doc. 59 at 8 (quoting *S.E.C. v. Bank of America Corp.*, 677 F. Supp. 2d 717, 719 (S.D.N.Y. 2010)). In *Bank of America Corp.*, however, the proxy statement with the alleged misrepresentation itself contained a warning indicating that shareholders "should rely only on the information contained . . . " in the proxy statement. *Bank of America Corp.*, 677 F. Supp. 2d at 718. Here, Zappia does not assert that the initial or amended proxy statement contained this language; rather Zappia quotes the Definitive Proxy,[4] meaning that all of the additional disclosures had been included in that one document, therefore no external information was needed. Doc. 60-1 at 2.

Finally, Zappia argues that the "relevant inquiry is not whether an actual conflict of interest exists, but whether full disclosure of potential conflicts of interest has been made." Doc. 53 at 23 (quoting *Wilson*, 855 F.2d at 994). The disclosure in question must still qualify as a substantial benefit to merit fees.

---

[4] Zappia only cites to the Definitive Proxy, which is the final version submitted on August 15, 2025. Doc. 59 at 8–9 (citing Doc. 60-1 at 2). That proxy included all the disclosures from the prior amended proxy statements. Doc. 60-1 at 2.

For the reasons set forth above, the Court finds that Zappia failed to meet his burden to show that the disclosure of Latham's potential conflict of interest provided a substantial benefit to AvidXchange's shareholders meriting attorneys' fees.

2. *The disclosure of Latham's exact monetary fee amount is not a substantial benefit*

Zappia argues that he should be awarded attorneys' fees because he conferred a substantial benefit to stockholders by "securing fulsome disclosure of Latham's conflicts" by having Defendants disclose the exact amount of fees paid to Latham by TPG. Doc. 53 at 15.[5]

Defendants argue that Zappia fails to meet his burden to demonstrate that the fee disclosure "alter[ed] the total mix of information necessary for stockholders to decide how to vote." Doc. 56 at 14 (quoting *Amalgamated Clothing, Inc.*, 54 F.3d at 71). The Supreme Court has held that it is unlawful to omit information "necessary to ensure that statements already made are clear and complete." *Macquarie*, 601 U.S. at 263. Some courts have found that specific monetary figures may be material facts to be disclosed. *See e.g. Roofers Local No. 149 Pension Fund v. Amgen Inc.*, 751 F. Supp. 3d 330, 348 (S.D.N.Y. 2024) (holding that the proxy statement was materially misleading where it stated that the "IRS was seeking [a] 'significant'" amount of money to mean that the company owed $10.7 billion in back taxes, which was "290.6% of its stockholders' equity"). Several courts have found that the exact fee amount is material where there is a potential conflict of a financial advisor. *See e.g. Chen v. Select Income REIT*, No.18-CV-10418-(KNF), 2019 WL 6139014, at *1–2, *13 (S.D.N.Y. Oct 11, 2019) (finding that the proxy's omission of "compensation" paid to sell-side financial advisor "for its previous

[5] With respect to the first amended proxy statement specifically, Zappia claims that Defendants' first amended proxy was insufficient because, though it included Latham's potential conflict of interest, it only stated that the fees accounted for less than 1% of Latham's revenue, which Zappia argues was insufficiently specific. Doc. 53 at 16–17. The Court finds this alone to be insufficient. Stating $57.7 million instead of "less than 1% of revenue," did not create a substantial benefit to the stockholders. Assuming their revenue was $12.7 billion as stated by Zappia, $57.7 million is well below the 1% threshold cited by Defendants in their initial amended proxy. Doc. 53 at 16–17

work" for parties to transaction was material). As explained above, financial advisors' conflicts of interest are well-documented as being material. Latham is not a financial advisor. Further, the court in that case was weighing four material omissions, which is also not the case here. *Chen*, 2019 WL 6139014, at *14.

Other courts, however, have found that the exact fee amount need not be disclosed. For example, in *Belcher* the court held that "[e]ven assuming *arguendo* that the specific amount . . . would have been material to a reasonable shareholder in determining whether to approve the merger that does not mean that the proxy . . . [was] false or misleading . . . because it omitted that amount." *Belcher*, 714 F. Supp. 3d at 386.

Zappia claims the Court should not follow *Belcher* because "here there was not just a pure omission, but omissions that rendered statements in the Proxy misleading." Doc. 59 at 8. However, fundamentally, as detailed above, Zappia has not demonstrated that even if the conflicts of legal counsel are material to voters, he has not demonstrated that the amount at issue here was material to alter the "total mix".

For the reasons set forth above, the Court finds that Zappia failed to meet his burden to show that the disclosure of the exact amount in fees received by Latham from TPG provided a substantial benefit to AvidXchange's shareholders meriting attorneys' fees.[6]

## III. DELAWARE LAW

### A. Legal Standard

In his complaint, Zappia brought a claim for breach of fiduciary duties pursuant to Delaware law for the missing proxy disclosures. Doc. 8 ¶ 1. Since this Court has

---

[6] Defendants further argue that the disclosure of "de minimis" conflicts of interest "do not rise to the level of a misleading partial disclosure." Doc. 56 at 14 (quoting *Topley*, 2021 WL 1172622, at *7). In that case, the court found that "the supplemental disclosures merely provided shareholders with additional details about information they already had," making the vote an already informed one. *Id.* at *5. The disclosures at issue there were details about the assumptions and valuation metrics used by the financial advisor to make the valuation analysis of the company and the "de minimis" amount of stock owned by the financial advisor. *Id.* at *7. The Court does not find that *Topley* is comparable to this case because the monetary amounts at issue are larger here and the conflict of interest is that of the financial advisor.

original jurisdiction over the federal claims brought in this case pursuant to 28 U.S.C. § 1331, the Court can exercise supplemental jurisdiction over this additional Delaware law claim pursuant to 28 U.S.C. § 1367.

Delaware courts recognize the American Rule "under which a prevailing party is responsible for the payment of his own counsel fees," and recognizes "certain restricted cases" where fee-shifting might be appropriate. *Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1164 (Del. 1989). "In the realm of corporate litigation, the court may order the payment of counsel fees and related expenses to a plaintiff whose efforts result in . . . the conferring of a corporate benefit." *Id*. (citing *Chrysler Corp. v. Dann*, 223 A.2d 384, 386 (Del. Supr. 1966). "[T]he benefit need not be measurable in economic terms . . . a heightened level of corporate disclosure, if attributable to the filing of a meritorious suit, may justify an award of counsel fees." *Id*. at 1165 (citing *Chrysler Corp*, 223 A.2d at 386; *Allied Artists Pictures Corp. v. Baron*, 413 A.2d 876, 878 (Del. Supr. 1980)).

For fees to be awarded in a moot case, the disclosures "must be 'plainly material' to stockholders, meaning whether 'there is a substantial likelihood that a reasonable shareholder would consider the information important in deciding how to vote' 'should not even be a close call.'" *Allen v. Harvey*, 2023 WL 7122641, at *4 (Del. Ch. Oct. 30, 2023) (quoting *In re Trulia, Inc. Stockholder Litigation*, 129 A.3d 884, 899 (Del. Ch. 2016)); *see also Anderson v. Magellan Health,* 298 A.3d 734, 898-99 (Del. Ch. 2023).

When deciding if something is material, the court must "review the disclosures with a 'defendant-friendly' perspective," and the claim must survive a motion to dismiss. *Id*. (quoting *Anderson*, 298 A.3d at 746-47 (Del. Ch. 2023)). "The plaintiff must also demonstrate that the action 'specifically and substantially benefitted the corporation and its stockholders.'" *Id.* (citing *Garfield v. Boxed, Inc.*, 2022 WL 17959766, at *10 (Del. Ch. Dec. 27, 2022)). "Supplemental disclosures that are not plainly material" will not meet this standard. *Id.* (citing *Anderson*, 298 A.3d at 749).

**B. Discussion**

*1. Pursuant to Delaware law, the disclosures at issue are not "plainly material" and thus do not merit fees.*

Zappia argues that he is entitled to attorneys' fees under Delaware law because he provided shareholders with a corporate benefit. Doc. 8 at 1.

Generally, under the corporate benefit doctrine a plaintiff must demonstrate "(1) the suit was meritorious when filed, (2) the defendants took an action that produced a corporate benefit before the plaintiffs obtained a judicial resolution, and (3) the suit and the corporate benefit were causally related." *Allen*, 2023 WL 7122641, at *3.

Because the Court has found that these disclosures are not material under the federal standard, they are not plainly material, as is required under the Delaware standard. *In re Trulia, Inc. Shareholder Litigation*, 129 A.3d 884, 898-99 (Del. Ch. 2016). *In re Trulia* established that the Delaware standard for what constitutes as "material" is comparable than that under federal law, stating that "Delaware has adopted the standard of materiality used under the federal securities laws. Information is material 'if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.'" *Id.* at 898. The judge further emphasized that "[i]n using the term 'plainly material,' I mean that it should not be a close call that the supplemental information is material as that term is defined under Delaware law." *Id.* at 899.

Most of the cases cited by Zappia involve financial advisors' or other non-legal counsel conflicts. *See Allen v. Harvey*, No. 2022-0248 (MTZ), 2023 WL 7122641 (Del. Ch. Oct. 30, 2023) (holding that plaintiff was entitled to fees after providing shareholders a substantial benefit by disclosing that one of the merging companies (Blackstone) was the sole sponsor of a company (Gryphon) founded by the director of the supposedly independent special committee recommending the merger and that Gryphon's management team also included three Blackstone executives); *Appel v. Berkman*, 180 A.3d 1055 (Del. 2018) (holding that a proxy statement was materially misleading where it did not disclose that the chairman of the company's board abstained from voting on its

sale and that his reasons for doing so contradicted the board's recommendations to the stockholders); *Millenco L.P. v. meVC Draper Fisher Jurvetson Fund I, Inc.*, 824 A.2d 11 (Del. Ch. 2002) (holding that an election could be invalidated where the proxy was materially misleading by omitting information about the relationship between the interested director of the company and two independent directors); *Vento v. Curry*, No. 2017-0157 (AGB), 2017 WL 1076725 (Del. Ch. Mar. 22, 2017) (finding that the SEC Registration Statement relating to the proposed merger failed to disclose information relating to their financial advisor's conflict of interest). As stated above, Latham was not in the same role in the underlying transaction.

However, Zappia does cite *City of Dearborn*, which in part discusses omissions concerning a law firm's concurrent representation of a counter party in a merger. *See City of Dearborn Police & Fire Revised Retirement System v. Brookfield Asset Management Inc.*, 314 A.3d 1108 (Del. 2024). In *City of Dearborn*, the Delaware Supreme Court found that a proxy statement was misleading because it did not inform the shareholders of the alleged conflicts of interest of the special committee's legal and financial advisors with the counterparty in the merger. *Id.* at 1113. The Delaware Supreme Court noted that while "[the law firm]'s prior conflicts with [the merging company] may not have been sufficient to state a claim, we hold that it is reasonably conceivable that the details of [the law firm's] conflicts, and particularly, the concurrent conflict, were material facts for stockholders that required disclosure." *Id.* at 1134.

However, the Court finds *City of Dearborn* distinguishable from the instant case. First, the Delaware Supreme Court examined the issue on a motion to dismiss, which has a lower burden of proof for a plaintiff than the instant motion. *Compare id.* at 1126 ("At the motion to dismiss stage, we must accept as true all of the plaintiff's well pleaded facts") (internal citations omitted) *with Allen*, 2023 WL 7122641, at *3 (stating that to succeed under the corporate benefit doctrine "the plaintiff must demonstrate: '(1) the suit was meritorious when filed, (2) the defendants took an action that produced a corporate

benefit before the plaintiffs obtained a judicial resolution, and (3) the suit and the corporate benefit were causally related.'") (internal citations omitted). Further, the law firm in *City of Dearborn* did not disclose its conflicts to the special committee nor to the public. *City of Dearborn*, 314 A.3d. at 1117. Here, Latham did disclose its potential conflicts with the special committee and the board. *See e.g.* Doc. 8 ¶ 50.

Further, the court in *City of Dearborn* evaluated additional conflicts of interest that were not disclosed, which is not an issue in the instant case. The financial advisors in the instant case served as independent advisors to the merger whereas in *Dearborn*, the financial advisors also had conflicts of interest, making the special committee's findings less reliable. "[I]t is imperative for the stockholders to be able to understand what factors might influence the financial advisor's analytical efforts" further stating that "because of the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives, the court has required full disclosure of investment banker compensation and potential conflicts." *Dearborn*, 314 A.3d at 1132.

In interpreting *City of Dearborn*, some courts of chancery have found that law firm conflicts must be disclosed in certain circumstances. *See e.g.*, *Firefighters' Pension System of the City of Kansas City v. Foundation Building Materials, Inc.*, No. 2022-0466 (JTL), 2024 WL 2795026, *35 (Del. Ch. May 31, 2024). In *Firefighters' Pension*, the court found the missing disclosures concerning the company's legal counsel to be material, however, in that case, the law firm had a longstanding relationship with the counterparty advising on deals worth over $9 billion, and for part of the sale process, represented the counterparty in the transaction. 2024 WL 2795026, at *5, *8. This, in addition to conflict of interest claims against two financial advisors, the inappropriate conduct of the company throughout the sale process, and the failure to disclose tax and fee agreements, were sufficiently alleged to allow the claims to survive the motion to dismiss. This case is not persuasive as the law firm's conflict is materially different to Latham's.

Further, Zappia makes no argument that the outcome under Federal Law and Delaware law should be different. Accordingly, the Court declines to award attorneys' fees based on the Delaware claims.[7]

## IV. CONCLUSION

For the reasons set forth above, Zappia's motion for attorneys' fees is DENIED. The Clerk of Court is respectfully directed to terminate the motion, Docs. 52, 58.

It is SO ORDERED.

Dated: August 17, 2026
New York, New York

EDGARDO RAMOS, U.S.D.J.

[7] Because the Court found that Zappia has not demonstrated that a substantial benefit has been conferred, the Court does not examine the further claims of the parties concerning the amount of the award or Defendants' argument that this is merely rent-seeking litigation.